UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

KIMBERLY BOHNERT,

        Plaintiff,

  v.

THE ROMAN CATHOLIC ARCHBISHOP
OF SAN FRANCISCO, et al.,

        Defendants.

Case No.  14-cv-02854-WHO

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
SUMMARY JUDGMENT**

Re: Dkt. No. 145-4

      Male students at Junipero Serra High School ("Serra") sexually harassed plaintiff Kimberly Bohnert while she was employed as a biology teacher, taking and disseminating several "upskirt"[1] photos and videos of her and other female teachers, among other things.  Serra is operated by defendant the Roman Catholic Archbishop of San Francisco ("the Archdiocese").  After the school and the Archdiocese allegedly failed to adequately remediate the harassment, Bohnert asserted that the Archdiocese and Serra created a hostile work environment, and brought claims against them based upon violations of the Fair Employment and Housing Act ("FEHA") and Title VII of the Civil Rights Act ("Title VII").  The defendants moved for summary judgment on all of Bohnert's claims, and I heard argument on September 9, 2015.

      There is no evidence that Serra is legally independent of the Archdiocese.  Instead, the evidence indicates that the school is wholly governed by the Archdiocese.  Defendants moved for summary judgment on the First and Third Causes of Action on the ground that Serra is not an

---

[1] As used in this Order, an "upskirt" video or photo is a photo or video taken under a person's clothes in order to view the genital area, usually by inserting a device with a camera up or under a skirt or dress, and without consent.

United States District Court
Northern District of California

1    "employer" under FEHA.  I GRANT that portion of the motion.[2]

2          However, in all other respects I DENY the defendants' motion because there are numerous

3    material issues of fact in dispute.  There are substantial questions whether a hostile work

4    environment existed at Serra and whether the Archdiocese adequately investigated and remediated

5    the problems about which it knew or should have known.  Bohnert's claims, if proven, support her

6    emotional distress causes of action.  And the Archdiocese's statute of limitations and ministerial

7    exception defenses are, at the very least, in dispute.

8                                    **BACKGROUND[3]**

9    **I.  BOHNERT'S WORK AT SERRA**

10         The Archdiocese operates Serra, an all-boys college preparatory school, as well as other

11   schools such as Marin Catholic High School and Archbishop Riordan High School.  Bohnert

12   began working for the Archdiocese at Serra in the fall of 2006.  Bohnert Depo. 121:3-8 (Barrett

13   Decl., Ex. 1).[4]  She was a member of the San Francisco Archdiocesan Federation of Teachers,

14   which was governed by a collective bargaining agreement ("CBA") with the Archdiocese.  *Id.* at

15   299:25-300:2.

16         Bohnert was hired as a biology teacher in the science department.  She taught four classes

17   instead of the customary five because she also worked in the campus ministry.  Bohnert Depo.

18   121:20-23, 145:19-146:8.  As part of the campus ministry, Bohnert sat on a panel that helped

19

20   _____

21   [2] Because Serra is not an independent legal entity, as described in Section II of the Discussion below, I assume that no cause of action can be asserted against it.  I do not make that finding because defendants did not make a motion to dismiss Serra from all of plaintiff's causes of action.

22   I will address this further if defendants move in limine for a complete dismissal of Serra.  For this reason, I refer to the defendant as "the Archdiocese" in this Order because of my assumption that it is the Archdiocese that is legally responsible for the conduct at Serra, and not the school itself.  I

23   also occasionally differentiate between the "Archbishop's office," which I define as including the senior leadership in the Archdiocese, and the school administrators at Serra (which would be

24   below the Archbishop's office on an organization chart).  The parties have used the term "Archdiocese level" to refer to the Archbishop's office, but that term is confusing because the

25   Archdiocese is one entity that includes Serra and the Archbishop's office; the school administrators' conduct, as a legal matter, is or may be "conduct at the Archdiocese level."

26   [3] The parties' motions to file their motions and supporting documents under seal are GRANTED in their entirety.  Defendants' requests for judicial notice of documents relating to Bohnert's

27   EEOC and DFEH charges are GRANTED.  *See* Dkt. Nos. 81-3, 96, 157.
     [4] The Barrett Declaration submitted by the Archdiocese is located in Docket Numbers 76-95 and

28   99-100, and the Kochan Declaration submitted by Bohnert is found in 111-125.

United States District Court
Northern District of California

create a "plan of action" to create an effective campus ministry. *Id.* at 125:6-13. Within the campus ministry, Bohnert was also the "Kairos director." *Id.* at 130:17-22. She testified that she helped develop the "Big Brother" and "Freshmen Formation" [5] programs, as well as Serra's "immersion program." *Id.* at 148:1-149:25.

As "Kairos director," Bohnert was the "behind-the-scenes gal making sure that everything goes according to plan." *Id.* at 140:11-15. Bohnert assisted some teachers and students in developing personal "witness talks" that they gave on the trips, though she never gave them herself. *Id.* at 140:18-141:22. Bohnert's Kairos retreat activities constituted one-fifth of her job. *Id.* at 145:19-146:7.

On "immersion" trips, Bohnert and other teachers took "the boys to go and live in solidarity with the people they're working and living among . . . [such as] living with them at the orphanage, helping the disabled children." *Id.* at 132:9-14. The trips, sometimes to other countries, were designed to apply basic Catholic teachings and assist those in need. *Id.* at 135:13-24. Bohnert was not one of the teachers who led the spiritual sessions or prayer on those trips. *Id.* at 136:1-7.

## II. HARASSMENT COMPLAINTS BEFORE 2012

Bohnert claims that the Archdiocese has had a "long history of sexual harassing conduct at its high schools, in particular the two all-boys schools, Riordan and Serra." Opp. 1 (Dkt. Nos. 109-110). She provides evidence of several examples of inappropriate conduct since 2006.

In 2006, Serra students placed posters in the school that depicted a female administrator in a demeaning manner. Ortiz Depo. 169:24-172:14 (Barrett Decl., Ex. 6 and Kochan Decl., Ex. 4). The same year, a Serra teacher caught a student after he took a photo of her rear end, and the student was suspended for a few days. *Id.* at 180:7-182:1.

---

[5] No party defined the term "formation." I understand it to include theological, moral and educational training. *See*, e.g., *Catholic Ethos, Formation and Religious Education Committee*, QUEENSLAND CATHOLIC EDUCATION COMMISSION, http://www.qcec.catholic.edu.au/committees/catholic-ethos-formation-and-religious-education-committee (last visited September 24, 2015); *What is Spiritual Formation and Why does it Matter?*, GRACE TO YOU, http://www.gty.org/blog/B120910/what-is-spiritual-formation-and-why-does-it-matter (last visited September 24, 2015).

United States District Court
Northern District of California

United States District Court
Northern District of California

A Serra teacher was victimized in a "stalking incident" around October 2006. *Id.* at 191:7-12. Between 2007 and 2008, that teacher was signed up for a dating website and pornographic site by a student or students, and was the target of sexual comments from a student in the hallway and in her classroom. *Id.* at 191:13-192:16, 195:1-5. Around the same time, she also received a number of inappropriate and sexually graphic cell phone messages. *Id.* at 193:25-194:20. The perpetrator was never found. *Id.* Bohnert also submitted evidence that in 2007, a Serra teacher received anonymous and threatening phone calls from a student, and complained that she did not feel safe. Dkt. No. 122-1 at 39. Also in 2007, a male faculty member at Serra made an unwanted sexual comment to another female faculty member by holding a rolled-up poster to his crotch and mentioning his "extension." *Id.* at 182:10-183:19.

In 2008, a Serra teacher sent Robert Ferretti, the Dean of Students, a complaint about sexual harassment. Kochan Decl., Ex. 17. In this complaint, she described how she caught a student in the midst of taking an upskirt photo of her. *Id.* She stated, "[t]his is the second time I have been sexually harassed by students at Serra," explaining that in the past, students pointed at her private parts with a laser pointer during class. *Id.*

In 2010, a Serra student exposed himself to a student from another school. *Id.* One month later a teacher expressed "concern" about objectification of women after a student had a pornographic image on a library computer. *Id.* In 2011, Serra students created a film for a class that depicted them without any clothes on. Dkt. No. 122-1 at 11-12. The teacher of the class expressed concern "about the accountability that these students hold for their actions and their deliberate decision to include . . . inappropriate scenes, language, insinuations. I feel personally and professionally affronted by the actions of the students." *Id.*

Bohnert also provided evidence of past sexual harassment during this time period at other schools that are part of the Archdiocese. This included a complaint from a female teacher at Marin Catholic High School that a student sent her sexually suggestive texts or emails, in which the school never found the perpetrator. Huntington Depo. 118:13-25 (Barrett Decl., Ex. 14, Kochan Decl., Ex. 6). There was also an incident at Marin Catholic around 2014 that involved an inappropriate photo of a teacher. *Id.* at 194:20-195:1. There is evidence that police were probably

4

1    not contacted about this.  *Id.* at 198:13-21.

2        In 2012, a female teacher at Archbishop Riordan High School was the victim of an upskirt

3    photo.  *Id.* at 163:14-16; Kochan Decl., Ex. 18 (Ex. 62).  There is no evidence that the police were

4    contacted about this incident, although the students found to have taken the photo were expelled.

5    Huntington Depo. 174:5-18, 176:1-4.  When asked if anybody investigated to find out if the photo

6    had been shared, Maureen Huntington, the Superintendent of Catholic Schools for the

7    Archdiocese who was responsible for ensuring the sexual harassment investigations were

8    conducted appropriately, stated that "it would be my assumption that [the dean of Riordan would]

9    check that out further than just look to see what pictures are in the photo gallery of the phone," but

10   that she did not confirm that assumption.  *Id.* at 176:7-23.  After these incidents, and after the later

11   incidents at Serra, the Archbishop's office did not take additional steps to "deal with the issue of

12   inappropriate photographs of female teachers after learning about what happened to" that teacher,

13   because they were deemed to be "individual isolated incidences."  *Id.* at 199:20-24, 200:10-13.

14       In addition, a teacher at Riordan was fired for inappropriate text communications with

15   another teacher but then re-hired because the Archbishop "wanted a different decision."  *Id.* at

16   266:4-268:24.  The victimized teacher expressed concern to the Archbishop's office about

17   working with the offending teacher again.  *Id.* at 280:15-23.

18       Finally, there was an incident at Sacred Heart High School where a student sent an

19   inappropriate message that involved a teacher.  *Id.* at 301:8-302:7-25.  The teacher expressed

20   dissatisfaction that the school had not taken more action than it did, stating that "[t]o not address

21   the issue with the community is akin to 'excusing' or 'dismissing' the email as 'typical teenage

22   behavior,' which I refuse to do."  *Id.* at 306:7-10.

23   **III. INCIDENTS INVOLVING BOHNERT**

24       In February of 2012, offensive and sexually violent graffiti directed at Bohnert was

25   discovered in one of Serra's bathrooms.  Ortiz Depo. 102:7-104:9, 129:8-25.  This graffiti

26   appeared to be similar to graffiti directed at Bohnert that had appeared a year earlier, in May of

27   2011.  *Id.* 129:8-11.  The graffiti was discovered on February 9, 2012, *id.* at 102:22-25, erased by

28   custodial staff, and not reported until February 15, when the graffiti reappeared.  *Id.* at 103:14-

United States District Court
Northern District of California

United States District Court
Northern District of California

1    104:8; Barrett Decl., Ex. 17.  Bohnert learned of the graffiti after another student described it for

2    her on a piece of paper.  Bohnert Depo. 211:14-24.

3           In response to this graffiti, the Assistant Principal of Academics at Serra, Keith Strange,

4    read a "Public Announcement" to the school that reminded them that graffiti was a crime and

5    requested information about the graffiti in the bathroom.  Barrett Decl., Ex. 3 (Ex. 104).  In the

6    PA, Strange stated that "[t]here has been some graffiti in the bathrooms over the last few days.  As

7    you know, graffiti is a form of vandalism and vandalism is a violation of the Student Code of

8    Conduct."  *Id.*  He concluded, "[V]andalism is a serious offense.  Anybody who vandalizes the

9    school will be suspended and possibly subject to more serious consequences."  *Id.*   Strange

10   decided not to mention that the graffiti was sexual or graphic.  Strange Depo. 107:10-13 (Barrett

11   Decl., Ex. 4).  He later testified that "we needed to respond first to the community as a whole,

12   meaning the students and the faculty . . . We also followed up with our faculty I believe the

13   following day."  *Id.* at 104:11-20.

14          Serra administrators instructed staff to take pictures of future graffiti so that they could

15   attempt to determine who created it.  Ortiz Depo. 108:13-25.  The Archdiocese asserts that it put

16   cameras up near the restrooms,  Mot. 6 (Dkt. No. 89), and that it took a more "aggressive

17   approach" by patrolling bathrooms more often.  Ferretti Depo. 41:13-21 (Barrett Decl., Ex. 3).

18   Bohnert did not believe the Archdiocese ever followed up or learned who made the graffiti.

19   Bohnert Depo. 214:5-25.  Strange testified that certain staff at Serra felt that the school had not

20   properly handled the graffiti incident, thinking that they had not appreciated how serious it was.

21   Strange Depo. 113:7-19.  Afterwards, Ortiz "checked in" with Bohnert via email to see how she

22   felt.  Bohnert Depo., Ex. 1013.

23          In late 2012, Bohnert was told by Serra's science department chair about an online

24   exchange between two students on Twitter that made sexual references to Bohnert.  Bohnert Depo.

25   195:10-196:23, 197:5-7; *see also* Bohnert Depo., Ex. 1008.  Earlier in the same Twitter

26   conversation, the students said more generally offensive things about women.  Bohnert Depo., Ex.

27   1008.  The science department chair reported the information to Serra administrators.  Bohnert

28   Depo. 198:2-7.  Shortly after this, Bohnert stated that the Assistant Principal of Student Life at

Serra, Marybeth Ortiz, approached her about the incident, and told her that she did not look at social media sites because "sometimes you just don't go there." *Id.* at 198:7-19.

In response to this incident, the school suspended the offending students for four days, ordered them to do service, and suspended them from playing in sports games for a period of time. *Id.* at 203:13-23; Ortiz Decl. ¶¶ 8-9 (Barrett Decl., Ex. 18). Both students were also prohibited from attending the semi-formal dance and had to petition to attend prom and graduation activities. *Id.* Both boys wrote Bohnert apology notes. Bohnert Depo., Ex. 1010. The Archdiocese asserts that since then, it is unaware of any offensive comments about Bohnert on social media. *Id.* ¶ 10.

Ortiz later testified that the Twitter exchange violated the Archdiocese's sexual harassment policy at Serra because it "us[ed] inappropriate words of a sexual nature." Ortiz Depo. 133:6-25. She stated, "It's talking specifically about one of our teachers, and it's just not appropriate and not what we would expect of our students." *Id.* at 133:23-25. Ortiz told the students to take down the offensive comments but did not ask them how widespread this type of language was at Serra. *Id.* at 137:17-25, 139:14-20. She testified that she did not look further into the offending students' Twitter accounts, or into other students' accounts, to determine if such language was more pervasive. *Id.* at 169:5-14.

According to Bohnert, before May of 2013, a male student who she did not teach would come by her classroom almost every day and stare at her, which Bohnert found to be "weird and creepy." Bohnert Depo. 354:2-25. This happened "weekly." *Id.* at 355:9. Bohnert never formally reported this behavior. *Id.* at 356:25-357:10. This student was later one of the students that was expelled for the upskirt incident. Ortiz Decl. ¶ 29.

## IV. MAY 15, 2013 UPSKIRT INCIDENT[6]

### A. Investigation

On May 16, 2013, a student told faculty members at Serra that there was an upskirt photo circulating of yet another female Serra teacher, "Teacher 2." Ferretti Depo. 70:6-13; Ortiz Decl. ¶

---

[6] In the interests of clarity and maintaining the confidentiality of the students, I simplify the Archdiocese's investigation of the May 2013 upskirt incident by Serra's administrators and include only information that is necessary to resolve this motion. However, I acknowledge that both parties submitted extensive evidence relating to specific students that they interviewed.

United States District Court
Northern District of California

1    11. Marybeth Ortiz, Serra's Assistant Principal of Student Life, and other Serra administrators

2    interviewed several students, at which time they learned that there may have been additional

3    photos of Bohnert and a third female teacher.  Ortiz Decl. ¶ 15.

4         Ortiz and Ferretti informed Bohnert that there was a rumor that photos or videos of her

5    were circulating at the school, similar to the video that was taken of Teacher 2.  Bohnert Depo.

6    254:19-255:2.  Bohnert became upset at Ferretti's categorization of a "rumor," since she believed

7    it was most likely true and "felt that it was put to me to figure it out."  *Id.* at 256:16-25.  Later, she

8    told Ferretti that she was going to the police station, and Ferretti offered to call the police for her.

9    *Id.* at 263:5-19.

10        That day, Ferretti, Ortiz, Strange, and Serra's Principal, Barry Thornton, interviewed

11   several students about the incident.  Ferretti Depo. 70:6-71:18; Ortiz Decl. ¶ 12.  Ortiz testified

12   that she learned that one student had allegedly shown others the photo.  Ortiz Depo. 215:1-5.  She

13   interviewed that student and another student, then set about interviewing nine more students.

14   Ortiz Decl. ¶ 12.  All of these students' cell phones were searched.  *Id.* ¶ 13.  Ortiz kept five of

15   those phones, which she believed had been used to take or forward the upskirt photo.  *Id.* ¶ 14.  All

16   five of those students were suspended pending further disciplinary review.  *Id.*  Serra

17   administrators interviewed more students that evening and the following day.  *Id.* ¶ 16.

18        Ferretti also spoke to some students on the phone.  One said that he hadn't received any

19   photos, so Ferretti did not question him further, relying on his word.  Ferretti Depo. 104:1-105:13.

20   Two others said they had received an upskirt photo but deleted it.  *Id.* at 106:2-23.  Ferretti did not

21   ask for these students' phones.  *Id.*  One student stated that other students were viewing an upskirt

22   video at his house but that he was not in the room and did not see it.  *Id.* at 180:9-25.  Ferretti did

23   not confirm whether that student had the video in his possession.  *Id.* at 181:2-7.  Of the phones he

24   checked, he did not look through apps other than texts or photos, or at emails.  *Id.* at 181:20-25.

25        Lars Lund, Serra's President, testified that he contacted a crisis management company

26   "that helps institutions deal with serious situations that are a crisis" on May 16.  Lund Depo.

27   241:3-21 (Vol. 2) (Barrett Decl., Exs. 2, 5; Kochan Decl., Exs. 3, 20).  The Archdiocese did not

28   contact the San Mateo police until the next morning.  Ferretti stated that the administrators at Serra

United States District Court
Northern District of California

United States District Court
Northern District of California

1   decided to wait until then because they were conducting the investigation and "seeing what we had

2   as the dust was settling."  Ferretti Depo. 171:19-25.

3       After contacting the police, the school's administrators held a faculty-wide meeting about

4   the incident, and made an announcement that conveyed, in Bohnert's words, that "there was an up-

5   skirt photo of a teacher . . . they are figuring out who the kids are and everything is under control."

6   Bohnert Depo. 264:14-17.  Ortiz assisted Bohnert in completing a Sexual Misconduct and

7   Harassment Complainant Statement Form.  *Id.* at 274:5-25; Ex. 1023.

8       The afternoon of May 17, the San Mateo police interviewed several members of the faculty

9   at Serra who had been investigating the students.  The administrators at Serra gave the officers

10  five phones that they had confiscated.  Ortiz Decl. ¶ 18.  Ortiz also interviewed three more

11  students who were aware of a video that had been taken of Bohnert.  *Id.* ¶ 17.  At least one had

12  received a video but claimed he did not remember where it came from and that he deleted it when

13  he heard the school was investigating the matter.  *Id.*  There is no evidence that this student was

14  disciplined.  Ortiz also learned that there may have been a video circulating of Bohnert months

15  earlier.  Ortiz Depo. 577:11-20.  The Archdiocese's "Crisis Response Team" at Serra also met for

16  several hours that day to discuss the upskirt issue.

17      On May 18, Thornton and Lund sent a letter to parents to inform them of the upskirt

18  incident and how the school was responding to it.  The letter stated that an "inappropriate photo"

19  was taken of a Serra faculty member; that the photo was "morally reprehensible" and "violated the

20  dignity and sacredness of every human being"; and that Serra was "doing everything" it could "to

21  protect the dignity and privacy of the offended faculty member."  Barrett Decl., Ex. 16.  It also

22  communicated that any inappropriate photography or texting would not be tolerated.  *Id.*

23      On May 20, Bohnert gave the Serra administrators more information that the police had

24  learned from a student, including evidence suggesting that a video of Bohnert was taken in her

25  classroom during a lab.  The same day, the Crisis Response Team met again for several hours.

26  Ortiz Decl. ¶ 19.

27      On May 21, Serra administrators held a mandatory assembly for all students and faculty

28  regarding the upskirt incidents.  Bradley Depo. 99:20-24 (Barrett Decl., Ex. 13).  San Mateo police

officers were there, and informed students that such conduct may be criminal.  *Id.* at 100:1-5.

During the assembly, Father Joseph Bradley spoke to the students, expressing his deep chagrin

that the incident had happened and that he felt as though he failed the school, and even using an

expletive in order to catch the students off guard.  *Id.* at 100:6-101:15.  After the assembly,

students returned to classrooms to reflect on the matter and were encouraged to report any relevant

information.  Lund Depo. 259:8-25.  The school sent a second letter to parents informing them of

the assembly and their continued response to the incident.  Barrett Decl., Ex. 16, Ex. A.

The same day, the police met with eight students, with Ferretti sitting in on the interviews.

Ferretti Depo. 126:6-17.  During this time, one student admitted to taking two upskirt videos of

Bohnert.  Barrett Decl., Ex. 8 (Ex. 115).  Another student showed an email from that student with

an upskirt video of Bohnert that was a few seconds long.  *Id.*  Two other students were found to

have taken the upskirt photo of Teacher 2.  Barrett Decl., Ex. 9 (Ex. 117).  Serra administrators

also interviewed five students who were not found to have taken or distributed any photos.

Officer Brian T. Curley, the San Mateo police officer who assisted in the investigation,

testified that Serra administrators had deleted some incriminating photos on students' phones.

Curley Depo. 49:8-23 (Barrett Decl., Ex. 7).  The police report of the incident includes statements

from students, including one from a student who had taken one of the upskirt photos, that "the

practice of taking under the skirt pictures of female teachers at Serra has been going on for over

three years."  Barrett Decl., Ex. 7.  There are "major bragging rights to anyone who can obtain the

photo of a teacher."  *Id.*  He also stated that there were multiple pictures and a video of two other

teachers currently at the school.  *Id.*  The report concluded that there were two upskirt photos of

Bohnert that had been taken but not discovered.  *Id.*  The police also received information that

there was a video of Bohnert that dated back to September of 2012.  Ortiz Depo. 589:14-24.

Another police report states that one of the students who sent an upskirt photo of Bohnert,

who was ultimately expelled, had been asked to delete the photograph from his phone by Serra

administrators.  Barrett Decl., Ex. 8 (Ex. 115).  A student that the police determined had taken or

sent upskirt media to others, and who lied about it, was not suspended or disciplined.  *Id.*  In

addition, the police report states that one student admitted to receiving three upskirt videos at one

1    time. *Id.*

2         The police reports indicated that Serra administrators had deleted or instructed students to

3    delete photos in the course of their investigation.  Specifically, Officer Brian Curley was told by

4    Ortiz that if a student had an incriminating photo on his phone, but had not forwarded it, the photo

5    was deleted and the phone was returned to the student.  Curley Depo. 31:4-11 (Barrett Decl., Ex.

6    7).  Ortiz also told Curley that another teacher had done the same.  *Id.* at 38:15-19.  Strange also

7    told Officer Curley that he had deleted photos from a student's phone.  *Id.* at 48:3-12.  Curley was

8    "irritated" because Ortiz was "basically destroying evidence of a crime."  *Id.* at 31:14-17.  He told

9    this to Ortiz.  *Id.* at 31:22-23.

10        In addition, there is evidence that Serra's football coach, Craig Gianinno, directed the

11   football team to delete any photographs on their phones.  Ortiz stated that Gianinno was not

12   questioned about that decision.  *Id.* at 553:17-20.  When deposed, Gianinno stated that he

13   discussed the ongoing investigation with the varsity team that he was coaching, and counseled

14   them that "if you can't give your phone to your mom or your grandmother and allow them to look

15   through your social media and you would hesitate to give them your phone, then you might want

16   to do something."  Gianinno Depo. 49:7-15 (Kochan Decl., Ex. 15).  He clarified that he "may

17   have said" that the students should get rid of such photos.  *Id.* at 50:21-51:3.  He confirmed that no

18   Serra administrators asked him whether he advised his players to delete photos.  *Id.* at 64:23-65:5.

19        At one point during the investigation, Bohnert expressed concern for a student who had

20   come forward because the other kids bullied him after he told the truth "about what was going on

21   with the videos and photos."  Bohnert Depo. 271:4-18.

22        The Archdiocese had several full-time IT staff at Serra, but they were not involved in the

23   investigation.  Ortiz Depo. 439:20-23.  The school also did not consider calling a forensics expert

24   to identify further students who had taken or viewed upskirt photos or videos.  Lund Depo. 262:9-

25   17 (Vol. 2).

26   **B.  Response**

27        After discovering who had taken the photos, Serra administrators proceeded to hold

28   Disciplinary Review Board meetings.  Ortiz Decl. ¶ 24.  In these meetings, Board members

United States District Court
Northern District of California

1    developed a discipline matrix in which they considered "the harm done to the victims; the harm

2    done to the community; the moral development of the students; the needs of the community to

3    heal; the voluntary nature of a student's admission of guilt; and the role of forgiveness in the

4    context of the Gospel." *Id.*  Four students were found to have aided in the taking of the upskirt

5    images, and the Board chose to expel them.  *Id.* ¶ 25.

6        Four other students were disciplined by suspending them for the remainder of the school

7    year; putting them on probation; placing them on activity suspension through the next fall;

8    requiring them to complete thirty hours of service, plus an additional 20 required for graduation;

9    requiring a statement reflecting on that service; and requiring them to attend a religious

10   reconciliation retreat.  *Id.* ¶ 26.  At least one of those students had lied about having a photo, but

11   Serra administrators later learned that he showed it to someone.  Ortiz Depo. 305:7-23.  One

12   student failed to comply with the requirements and was expelled.  Ortiz Decl. ¶ 27.

13       Serra administrators determined that one student received and re-sent an image of Teacher

14   2, but did not expel him because he had come forward voluntarily.  *Id.* ¶ 28.  The school

15   disciplined him in the same manner as the other students except that he was not suspended for the

16   remainder of the school year, was placed on activity suspension only until June 14, 2013, and was

17   suspended for the first game of the football season.  *Id.*

18       The students that were apprehended were from different class levels, on different sports

19   teams, and were in different social groups.  Ferretti Depo. 88:3-18.

20   **V.  AUGUST 2013 MEME**

21       On August 21, 2013, Bohnert found a "meme" on the internet about her that was sexually

22   graphic and violent.  Bohnert Depo., Ex. 1014.  Bohnert contacted the police and asked the

23   website to remove the meme.  *Id.* at 222:11-25.  She deduced that the meme was posted by a Serra

24   student because the same poster had also posted about other Serra teachers, and because the meme

25   was similar to the graffiti in the bathroom.  *Id.* at 223:9-19.  Bohnert sent an email to Lund and

26   another teacher informing them of the meme and its similarity to the graffiti.  *Id.*, Ex. 1014.

27       Bohnert testified that she was not aware of any action that the Archdiocese took with

28   respect to the meme.  *Id.* at 227:18-20.  After she notified Lund of the meme, Lund said that if he

found out "it's Serra-related, he [would] help [Bohnert] or try to figure out who it is or something of that nature." *Id.* at 222:4-8. The Archdiocese submitted evidence that its IT staff at Serra investigated the meme by reviewing thousands of postings to find more information about the meme's creator. Ortiz Depo. 21:8-24.

## VI. THE RESPONSES TO THE MAY 2013 UPSKIRT INCIDENT IN THE 2013-2014 SCHOOL YEAR BY SERRA ADMINISTRATORS

The police report that discussed the May 2013 upskirt incident indicated that the practice of taking upskirt videos had been ongoing for several years. Ortiz Depo. 414:9-14. Ferretti confirmed that he heard that from the police report that there was some sort of upskirt "challenge" among the student body. Ferretti Depo. 134:25-135:4 (Vol. 2). Strange also testified that he had heard about a possible challenge at the school to obtain upskirt photos of female teachers. Strange Depo. 75:9-15. In addition, Ortiz learned from a student that "taking up-skirt photographs was part of a contest that had been going on for some years." Ortiz Depo. 300:6-9.

The school did not conduct any investigation into whether this rumored "challenge" had in fact occurred. *Id.* at 144:145:25, 148:1-16. According to Lund, the school was focused on finding the students responsible for the May 2013 upskirt incident, but not necessarily on determining whether there was a pattern of upskirt practices. Lund Depo. 255:10-256:10 (Vol. 2). Although Lund knew from the police report that there was a competition at the school to take upskirt photos, and was "shocked" to learn it, he could not recall whether he did anything to find out if the competition existed or was ongoing. *Id.* at 287:2-20 (Vol. 2).

Ortiz testified that after the May 2013 upskirt incident and investigation, Serra has not made efforts to determine whether students were continuing to attempt to take upskirt photos. *Id.* at 665:3-13. She stated that she did not believe that students were doing so because "we've made adjustments in what we do at the school and we've worked with our students in what's appropriate." *Id.* at 665:17-24.

Since the upskirt incident, Serra has held "a series of formation presentations that Serra students and faculty members are required to attend." Ortiz Decl. ¶ 34. Formation meetings focused on social media were held on September 17, 2013, for parents and on September 18 for

1    students.  *Id.* ¶ 35.  On October 22, another meeting was held that focused on sexism and gender

2    respect.  *Id.* ¶ 36.  This meeting did not specifically discuss sexual harassment.  Bradley Depo.

3    114:4-7.

4        Tim Egan, a Counselor at Serra, testified that he assisted with one formation related to

5    gender representation and the media.  Egan Depo. 18:1-25 (Barrett Decl., Ex. 10).  He was not

6    sure whether this formation specifically addressed the May 2013 upskirt incident.  *Id.* at 20:9-14.

7    He described the goal of the formation as "help[ing] kids see the inherent biases in the way that

8    gender can be represented in popular culture and hopefully cause them to . . . take a more critical

9    stance to those representations."  *Id.* at 22:12-18.  He expressed that he was upset by the lack of

10   respect that students paid to the formation, but nothing was done to correct this behavior.  *Id.* at

11   105:10-17.  After the presentation, Egan sent an email to Ortiz expressing his dissatisfaction with

12   the presentation, describing the presenter as "terrible" and the formation as an embarrassment.  *Id.*

13   at 132:15-133:13.  Lund also testified that he received negative feedback about the formation.

14   Lund Depo. 128:14-22 (Vol. 2).

15       In the fall of 2013, parents were encouraged to take parent formation webinars focused on

16   "Gender, Sexuality, and Diversity."  Ortiz Decl. ¶ 37.  The school also extended a harassment

17   training that was originally required only for supervisors to all faculty and staff.  Lund Depo.

18   203:5-25, 260:5-13.  It also required teachers to complete a training that focused on sexual

19   harassment in February of 2014.  *Id.* at 311:4-312:13; *see also* Barrett Decl. Ex. 2, Ex. 22.

20       The school's "Report on steps taken to encourage gender respect and discourage

21   inappropriate use of technology" lays out several measures that it implemented throughout the

22   2013-2014 school year.  Barrett Decl. Ex. 2, Ex. 17.  During the first semester, it held five student

23   training events: three in the opening week of school and two later formation events (the "digital

24   citizenship" and "gender respect" formations).  *Id.*  In the second semester, it focused on "specific

25   training of faculty and staff," including the February 2014 anti-harassment seminar.  *Id.*

26       Finally, Ortiz led a religious reconciliation retreat in the spring of 2014 with the students

27   that had been disciplined but not expelled for the upskirt incident.  *Id.* ¶ 38.  This focused on faith,

28   forgiveness, and respectful treatment of others.  *Id.*

## VII.    OTHER RESPONSES

According to the deposition of Father Bradley, he was unaware of any program at the school that was directed at issues of gender respect or sexual harassment before May of 2013. Bradley Depo. 107:10-15.  Huntington, the Superintendent of Catholic Schools for the Archdiocese, testified that she did not ensure that administrators at Serra obtained the police report after the Bohnert upskirt incident, though she believed it would have been appropriate for them to do so.  Huntington Depo. 235:1-236:9.  Ortiz also testified that during the investigation of the May 2013 upskirt incident, she did not think that the Archbishop's office was involved in the investigation other than receiving updates.  Ortiz Depo. 297:10-298:5.  In addition, Lund stated that no formal IT policy has been implemented to address internet harassment.  Lund Depo. 331:16-20.

Bohnert was on leave of absence between May 17, 2013 through the 2013-14 school year. 331:9-332:3.  She asserts that she was in regular contact with teachers and administrators from Serra.  Bohnert Decl. ¶ 2 (Kochan Decl., Ex 1).  Bohnert learned several things about the way the school was reacting to the sexual harassment allegations that concerned her: (i) the October 2013 "Gender and Respect Formation" was widely ridiculed; (ii) in December of 2013 a Serra student sent an inappropriate sexual email that showed disrespect for women; (iii) in January 2014 a female Serra teacher found an offensive word carved into a desk in her classroom, had her classroom door lock jammed with plastic, and received a serious of anonymous phone calls at her house; (iv) in January 2014 a teacher at another Archdiocesan school was the victim of inappropriate, sexualizing images that had been taken of her; (v) in March 2014 a Serra student was suspended for derogatory and sexist Tweets; (vi) an administrator at another Archdiocesan school allegedly showed other administrators and faculty pornographic photos, including one of a current student; and (vii) in September 2014 a female Serra teacher complained about a Serra student who made sexual references in class.  *Id.*

Ortiz confirmed that in January of 2014 there was a problem brought to her attention by a Serra teacher involving offensive desk carvings and other incidents.  Ortiz Depo. 62:4-18.  That teacher filled out the same complaint form that Bohnert had.  *Id.*  Ortiz also confirmed that a

student sent the inappropriate December 2013 email that looked like it was sent from a female administrator.  Ortiz Depo. 186:9-23.  That student was expelled.  *Id.*

Ortiz also stated that there was an incident in September of 2014 when a student made sexual references in class.  *Id.* at 198:16-23.  His teacher also reported that she "felt something on her leg and discovered that a student had attempted to take an up-skirt photo of her," but there is no evidence of when this was.  *Id.* at 199:19-23.

On March 18, 2015, another upskirt incident took place at another Archdiocesan school.  Huntington Depo. 323:18-324:4.  Huntington did not know if anyone contacted the police, how the school responded, or whether the police conducted an investigation.  *Id.* at 324:5-24.  Huntington did not follow up about whether the police were contacted and made no effort to get the police report.  *Id.* at 324:25-325:9.

Huntington testified that in the last five years the Archdiocese has not taken any effort "to find out how widespread the practice of taking upskirt videos at its all-boys high school actually is."  *Id.* at 301:2-7.  The Archdiocese has also not done anything to determine whether there is a possibility that there is more widespread behavior of harassment than the incidents that occurred at the various schools.  *Id.* at 327:17-328:2.

On July 21, 2014, Bohnert submitted a letter of resignation to Serra.  She stated that although she had "hoped that the school could renew itself in the wake of such a horrible situation," she did not feel protected and could not return to work.  Bohnert Decl., Ex. 1.  She stated, "I feel I have no choice but to resign in that there has not been any policy and procedural changes that will ensure a different plan of action when this type of offense happens again and there is no reason to believe that the female teachers (or the students and teachers who stand up for them) will be protected."  *Id.*

## VIII.   EXPERT REPORT

Bohnert submitted an expert report that concludes that the Archdiocese failed "to follow standard practices and its own policies and procedures with respect to investigating certain harassment allegations."  Kochan Decl., Ex. 2.  This includes "the failure to properly investigate harassment allegations which were similar to incidents experienced by plaintiff Kim Bohnert," and

United States District Court
Northern District of California

"the failure to properly investigate harassment incidence[s] directed to or relating to Ms. Bohnert." *Id.*

Specifically, the expert report highlights that investigations were generally conducted at the level of the high school administrations, with the Archbishop's office learning of the outcome only afterwards. *Id.* at 3. The expert found that confidentiality was not always maintained during investigations. *Id.* at 5. It highlights specific instances where the school failed to properly interview witnesses, inadequately responded to or reprimanded those guilty of harassment, failed to corroborate allegations, and failed to perceive patterns of discrimination and harassment. *Id.* at 5-12. It also pointed out the problems in Serra administrators' interviewing students over the phone, where credibility is not readily assessed and where the student may delete incriminating evidence without detection. *Id.* at 26-27. The expert noted that Serra administrators often couldn't remember crucial details of the investigation, indicating a general lack of coordination and thoroughness. *Id.* at 17.

## LEGAL STANDARD

A court will grant a motion for summary judgment where the pleadings, discovery and affidavits show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The court should first make all reasonable inferences in favor of the non-moving party, and then determine whether genuine issues of material fact exist. *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to prevail, the nonmoving party must demonstrate with reasonable particularity that the evidence precludes summary judgment. *Noriga, v. Ahmed*, No. CV 12–0889 WHO (PR), 2013 WL 3461931, at *1 (N.D. Cal. July 9, 2013).

## DISCUSSION

## I.  EVIDENTIARY OBJECTIONS

At the summary judgment stage, courts should not focus on the admissibility of the form of evidence that the parties submit, but on the admissibility of the contents of the evidence. *Fraser v.*

*Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001). "Rule 56 is precisely worded to exclude evidence only if it's clear that it cannot be presented in an admissible form at trial." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 964 n.7 (9th Cir. 2011). Rule 56(e) requires that evidence submitted in affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." *Block v. City of Los Angeles*, 253 F.3d 410, 419 (9th Cir. 2001) (quoting FED. R. CIV. P. 56(e)).

Both parties' evidentiary objections consist of objections to the form of the evidence. For example, they argue that certain portions of the depositions contain information that lacks foundation, is irrelevant, is inadmissible hearsay, or is responsive to leading questions. *See* Dkt. Nos. 140-6, 146-2. Such objections are not appropriate for a Rule 56 motion. *Slojewski v. Polam Fed. Credit Union*, 473 F. App'x 534, 536 n.1 (9th Cir. 2012). Both parties' evidentiary objections are DENIED.

## II. SERRA IS NOT AN "EMPLOYER" UNDER FEHA

The parties dispute whether Serra is a separate legal entity from the Archdiocese, or is instead a distinct "nonprofit public benefit corporation" that operates an educational institution as its sole or primary activity. If it is a "nonprofit public benefit corporation," it may be considered an "employer" under FEHA. If it is the same legal entity as the Archdiocese, it is not an "employer" under FEHA because FEHA provides an exception for religious entities. CAL. GOV'T CODE § 12926(d).

The parties made similar arguments in briefing the defendants' motion to dismiss. *See* Order (Dkt. No. 36). I stated that "[d]efendants may ultimately be correct that Serra is not an 'employer' under FEHA . . . but the financial statements and other documents do not foreclose the possibility." *Id.* at 7. In that Order, I held that Serra could potentially be a separate legal entity as a matter of pleading. *Id.* At the same time, I dismissed Bohnert's claim with leave to amend because she had pleaded that Serra and the other defendants were a single employer. *Id.*

In moving for summary judgment, Serra presented the same documents that it provided in

United States District Court
Northern District of California

its motion to dismiss:  (i) the articles of incorporation of the Archbishop Corporation, the Real Property Corporation, and the Capital Assets Corporation filed with the California Secretary of State; (ii) financial statements for the Archbishop Corporation; (iii) Private School Affidavits Confirmations filed with the California department of Education; and (iv) the CBA between the Archbishop Corporation and Serra's teachers.  *See* Huntington Decl. (Barrett Decl., Ex. 15).  The Private School Affidavits list the Archbishop of San Francisco as the "Director or Principal Officer" and the address of the Archdiocese as the business address.  *Id.* ¶ 5.[7]

The CBA covers "lay teachers in the archdiocesan high schools" and is an agreement between the Archdiocese and the San Francisco Archdiocesan Federation of Teachers.  CBA at 1 (Bohnert Depo., Ex. 1033).  It refers to the Archdiocese as the "employer" and states that the Archdiocese "operates and maintains all Archdiocesan high schools."  *Id.* at 6.  Although the CBA does affirm that school principals have the right to oversee individual schools, it emphasizes that the Archbishop is the ultimate leader of all the Archdiocesan schools.  *See id.* at 7 (stating that "[t]he Archbishop or Superintendent may assign a President to a school to maintain the Catholicity of the school and to provide for the spiritual dimension of the school community" and "[t]he Archdiocesan Board of Education shall have the exclusive right to determine whether to suspend or discontinue in any respect the operation of any Archdiocesan high school for whatever reason the Board deems appropriate").

The financial statements include receivables from loans to the Archdiocesan schools, including Serra.  Dkt. No. 9 at 44.  They also include assets held for tuition grants and scholarships.  *Id.* at 47.  Finally, the Archdiocese provided a declaration that "Serra does not exist as a separate legal entity."  Huntington Decl. ¶ 4.

Bohnert failed to meet her burden of establishing a triable fact that Serra is separate from the Archdiocese.  She has not presented any evidence that demonstrates that Serra is a distinct legal entity, let alone that it does not fall within the definition of "employer" as defined in the California Government Code.  There is no circumstantial evidence to contradict Serra's evidence,

---

[7] The name of the party used in the CBA is the Corporation Sole, which is the corporate entity referred to in this Order as the Archdiocese.

United States District Court
Northern District of California

1    such as articles of incorporation for Serra, separate financial documents, or any other information

2    that would indicate that Serra is not the same legal entity as the Archdiocese.  Bohnert contends

3    only that Serra's principals are responsible for the day-to-day operations of the school, while the

4    Superintendent of the Archdiocese has no such responsibility.  Oppo. 12 (Dkt. No. 109-110).  That

5    may be true as a factual matter, but it has little bearing on the legal existence of Serra.

6           In other contexts, courts have held that religious schools are to be treated as a religious

7    organization where they are not separate legal entities.  *St. Martin Evangelical Lutheran Church v.*

8    *S. Dakota*, 451 U.S. 772, 772 (1981) (school not separate legal entity, was controlled by Board of

9    Education elected from congregation, was financed by congregation, and was not separately

10   incorporated); *Coleman-Edwards v. Simpson*, No. 03CV3779DLIVVP, 2008 WL 820021, at *12

11   (E.D.N.Y. Mar. 25, 2008) *aff'd,* 330 F. App'x 218 (2d Cir. 2009); *Baker v. Roman Catholic*

12   *Archdiocese of San Diego*, No. 14CV800 JM JMA, 2014 WL 4244071, at *3 (S.D. Cal. Aug. 26,

13   2014).

14          By contrast, Bohnert did not cite any case in which a school that was not a separate legal

15   entity from a religious organization was determined to be separate from that organization.  In fact,

16   the California Court of Appeal has held the opposite.  In *Henry v. Red Hill Evangelical Lutheran*

17   *Church of Tustin*, the defendant was a school affiliated with the Lutheran church, but did not

18   require all teachers to be Lutheran.  201 Cal. App. 4th 1041, 1046 (2011).  The court found that

19   the school was part of the church under FEHA, and not an "employer."  *Id.* at 1049.  The court

20   rejected the plaintiff's argument that "the school operated by the church as part of its ministry is a

21   nonprofit public benefit corporation."  *Id.* at 1050.  It stated that there was no evidence for this

22   conclusion and "[t]o the contrary, the school has no independent legal status apart from the

23   church."  *Id.*

24          This case is similar to *Henry*.  After reviewing all of the undisputed material facts, I find

25   that no reasonable jury could find that Serra is a separate legal entity.  Accordingly, Serra is not an

26   "employer" under FEHA.  Serra's motion for summary judgment on the FEHA claim is

27

28

GRANTED.[8]

## III. THE ARCHDIOCESE'S FIRST AMENDMENT RIGHTS ARE NOT IMPLICATED BY PLAINTIFF'S CLAIMS

The Archdiocese argues that I should not review Bohnert's claims because doing so would impermissibly interfere with its First Amendment rights.  Mot. at 21.  First, it argues that the "ministerial exception" prevents me from reviewing plaintiff's Title VII and FEHA claims.  *Id.* at 23-24.  Second, it argues that the "church autonomy doctrine," which "prohibits civil court review of internal church disputes involving matters of faith, doctrine, church governance, and polity," precludes review of all causes of action.  *Id.* at 21.  Although these arguments overlap to some extent, I address them separately.

### C.  Ministerial Exception

Courts recognize a "ministerial exception" to state and federal employment laws that exempts religious institutions from compliance with certain statutes.  *Alcazar v. Corp. of the Catholic Archbishop of Seattle*, 627 F.3d 1288, 1290 (9th Cir. 2010).  This exception derives from the Free Exercise and Establishment Clauses of the First Amendment, and is designed to protect "a church's personnel decisions concerning its ministers" and to allow "the church to choose its representatives using whatever criteria it deems relevant."  *Id.* at 1291.  A "paradigmatic application" of this exception is a church's employment of an ordained minister such as a Roman Catholic priest.  *Id.*

Courts have been reluctant to apply a "rigid formula" that prescribes when a religious employee is considered to be a "minister."  *Hosanna-Tabor Evangelical Lutheran Church & Sch. v. E.E.O.C.*, 132 S. Ct. 694, 707 (2012); *Alcazar*, 627 F.3d at 1291.  They often focus upon "the actual functions of the employees said to be within the exception," and consider whether they are ordained, teach religion to other members, or perform duties that are primarily religious in nature.  *Spencer v. World Vision, Inc.*, 633 F.3d 723, 761 (9th Cir. 2011); *Alcazar*, 627 F.3d at 1291; *see*

---

[8] Bohnert also makes the arguments that both the Archbishop and Serra were her employers, and that section 12926.2 demonstrates a legislative intent "to rein in the seemingly unfettered breadth of the FEHA's religious exemption as applied to hospitals and schools."  Oppo. 12.  These arguments are irrelevant in light of my determination that Serra is not a separate legal entity.  *See Henry*, 201 Cal. App. 4th at 1050.

*also DeMarco v. Holy Cross High Sch.*, 4 F.3d 166, 172 (2d Cir. 1993); *Henry*, 201 Cal. App. 4th at 1055.

When addressing whether schoolteachers fall within the "ministerial exception," courts reach different conclusions depending on the teacher's duties and function within the church.  In *Hosanna-Tabor*, the Supreme Court found that a teacher was a "minister" where the church held her out as a minister distinct from other members; she was "called" to be a "Minister of Religion, Commissioned"; the congregation prayed to "bless her ministrations"; she had "a significant degree of religious training"; and she taught religious teachings and led students in prayer.  132 S. Ct. at 707-08 (emphasizing "the formal title given [plaintiff] by the Church, the substance reflected in that title, her own use of that title, and the important religious functions she performed for the Church").

By contrast, other courts have found teachers were not ministers where they were not ordained or a member of the clergy, where they primarily taught a secular subject, and where they were otherwise not spiritual or religious leaders within the church.  *See Redhead v. Conference of Seventh-Day Adventists*, 440 F. Supp. 2d 211, 221 (E.D.N.Y. 2006) *adhered to on reconsideration,* 566 F. Supp. 2d 125 (E.D.N.Y. 2008) ("plaintiff's teaching duties were primarily secular; those religious in nature were limited to only one hour of Bible instruction per day and attending religious ceremonies with students only once per year."); *Guinan v. Roman Catholic Archdiocese of Indianapolis*, 42 F. Supp. 2d 849, 852 (S.D. Ind. 1998) ("[plaintiff] did participate in some religious activities as a teacher at All Saints, but it cannot be fairly said that she functioned as a minister or a member of the clergy"); *cf. Henry*, 201 Cal. App. 4th at 1055 (plaintiff "fulfilled [spiritual] function by teaching her preschoolers religion, leading them in prayers every day, and leading chapel services.  She taught religion and spread the faith.").

Bohnert is not an ordained minister, and there is no evidence that the church held her out as one.  She is not "called," and has no specific educational degree other than a Bachelor of Science in biology, a doctor of pharmacy, and a credential to teach biology.  Bohnert Depo. 32:11-33:25.  The Archdiocese does not dispute any of these facts.  Instead, it highlights Bohnert's role as "an active and integral member of Serra's Campus Ministry Department," her position as

22

United States District Court
Northern District of California

1   Kairos Retreat Director, and her development of the Big Brother program and the Freshman

2   Formation program.  Mot. 25-26.  It also argues that unlike other teachers, Bohnert spent one of

3   her five class periods on Campus Ministry duties.  *Id.* at 25-26.

4        These job duties do not establish that Bohnert served as a minister.  Bohnert presented

5   undisputed evidence that her function in the Campus Ministry, the "immersion" groups, and the

6   Kairos retreats, was not to provide spiritual or religious guidance.  Instead, she assisted with the

7   logistics of students trips and helped facilitate the programs.  Although certain teachers led prayers

8   or focused on spiritual outreach, Bohnert was not one of them.

9        Similarly, the Big Brother and Freshman Formation programs were not primarily religious

10  in nature.  The Freshmen Formation program was designed to "help freshmen transition into Serra

11  High School."  Bohnert Depo. 148:2-6.  The Big Brother program was aimed at community

12  service or school improvement activities.  It is not clear that these programs primarily served to

13  further the religious mission of the church.

14       The facts support Bohnert's argument that she was not a minister for the purposes of her

15  Title VII claim.  At the very least, the determination of whether the "ministerial exception" applies

16  depends upon numerous factual determinations, such as whether her functions were primarily

17  spiritual or religious in nature, or whether the church held her out as a spiritual leader.  *See*

18  *DeMarco*, 4 F.3d at 172 ("Given that the religious duties that DeMarco allegedly failed to carry

19  out are easily isolated and defined, we are confident that the able district judge will be able to

20  focus the trial upon whether DeMarco was fired because of his age or because of failure to

21  perform religious duties, and that this can be done without putting into issue the validity or

22  truthfulness of Catholic religious teaching").  The Archdiocese has not demonstrated that there are

23  no issues of material fact and that Bohnert is a minister as a matter of law.  Accordingly, the

24  "ministerial exception" does not prevent Bohnert's claims from going forward.

25  **D.  Church Autonomy**

26       The Archdiocese also asserts that Bohnert's claims will impermissibly impinge upon the

27  church's autonomy because they require an evaluation of its internal religious policies.  In support

28  of its position it relies primarily on a case decided by the Washington Court of Appeals, *Elvig v.*

*Ackles* ("*Elvig II*"), 123 Wash. App. 491, 493 (2004).  In *Elvig II*, the plaintiff was an ordained Presbyterian minister who worked for the Presbyterian Church.  *Id.*  She filed claims against the Church after she was allegedly sexually harassed by her supervisor and experienced retaliation.  *Id.*  After the plaintiff filed a complaint with the church, the church underwent an internal investigatory process.  *Id.* at 494.  It ultimately decided not to file charges against the supervisor.  *Id.* at 494.

The Washington Court of Appeals found that the First Amendment barred the plaintiff's claims.  It cited to the church's "Book of Order" which governed dispute resolution within the church.  *Id.* at 498-99.  The court found that to decide the plaintiff's claims "would require a secular court to examine decisions made by ecclesiastical judicial bodies."  *Id.*  In declining to review the plaintiff's claims, the court stated that its "ruling is a narrow one."  *Id.*  The court also distinguished an earlier decision by the Ninth Circuit in the same case, stating that the Ninth Circuit decided a motion for judgment on the pleadings, while the Washington case was resolved on summary judgment.

In the earlier Ninth Circuit case, the district court dismissed the plaintiff's Title VII and retaliation claims based upon the same harassment and retaliation.  *Elvig v. Calvin Presbyterian Church* ("*Elvig I*"), 375 F.3d 951 (9th Cir. 2004).  Reviewing the district court's judgment on the pleadings de novo, the Ninth Circuit found that the church's decision to terminate the plaintiff was protected by the ministerial exception.  *Id.*  However, it found that the First Amendment did not foreclose the plaintiff's claims based on harassment and a hostile work environment, stating that a showing of these claims would "involve a purely secular inquiry."  *Id.* at 959.  The court noted that "the Church may nonetheless invoke First Amendment protection from Title VII liability if it claims that [plaintiff's] subjection to or the Church's toleration of sexual harassment was doctrinal."  *Id.*  It pointed out that the church had not argued that "religious doctrine tolerates sexual harassment or compelled the Church to respond to [plaintiff's] complaints in ways that would be seen as unreasonable in the context of proving its . . . affirmative defense."  *Id.* at 963.  Because the defendants did not offer a religious justification for the harassment alleged, the claims were not barred by the First Amendment.  *Id.* at 959.

The Archdiocese argues that this case is on all fours with *Elvig II*, because its "response to the incidents about which Plaintiff complains were intrinsically entwined with Serra's Catholic tenets and ecclesiastical decision-making." Mot. 22. It points to its "policies that are entrenched with Catholic values," its student-parent handbook, and the deposition transcripts of Lund and Ortiz. *Id.* at 23. These facts do not support the Archdiocese's argument.

*Elvig I* is binding precedent. *Elvig II* is not. In addition, *Elvig II* is readily distinguishable from this case. *Elvig II* discussed a church's decision to investigate harassment that was both allegedly committed by and directed at ordained ministers and that fell within the ministerial exception. *Elvig II*, 123 Wash. App. at 496. Further, the court relied heavily upon the fact that the church had undergone a formal decision-making process, including an appeal, that the court risked undermining if it ruled on the plaintiff's claims. *Id.*

As discussed, the Archdiocese has not established that Bohnert was a minister. It did not present any evidence of a formal decision-making process, let alone one that could be considered "ecclesiastical." *See* Barrett Decl. Exs. 2, 6; Bohnert Depo., Ex. 1032. Although the Archdiocese argues that Catholic "principles" influenced its actions and that "any review by a court . . . would entail a review of the reasonableness of Catholic principles that were followed in responding to Plaintiff's complaints," Mot. 23, this reasoning would immunize it from judicial review of almost any cause of action. This is clearly not the law.

*Elvig I* is the law, and its reasoning applies to this case. As *Elvig I* stated, evaluating the church's responses to sexual harassment does not "necessarily require [the court] to decide among competing interpretations of church doctrine, or other matters of an essentially ecclesiastical nature." *Bollard v. California Province of the Soc'y of Jesus*, 196 F.3d 940, 946 (9th Cir. 1999). Bohnert does not attack the reasonableness of any Catholic principles. *See* Oppo. 28 ("it does not follow that the destruction of evidence the failure to fully investigate to find out the scope of the upskirting, and the corresponding failure to remediate involves an adjudication of the reasonableness of Catholic principles"). In fact, Lund agreed that potential sexual harassment is behavior "that can be identified without the application of any particular religious perspective or knowledge." Lund Depo. 290:12-14. As in *Elvig I*, the Archdiocese did not present any facts

United States District Court
Northern District of California

United States District Court
Northern District of California

1   suggesting that its religious doctrine tolerates harassment or required it to respond in a way that

2   conflicts with its teachings.

3         Bohnert has presented a triable issue of fact that her claims are a "purely secular matter"

4   that may be reviewed by this Court. *See Bollard v. California Province of the Soc'y of Jesus*, 196

5   F.3d 940, 950 (9th Cir. 1999) ("the jury must make secular judgments about the nature and

6   severity of the harassment and what measures, if any, were taken by the [church] to prevent or

7   correct it"); *Elvig I*, 375 F.3d at 959.  The Archdiocese is not entitled to summary judgment on the

8   basis of the First Amendment.

9   **IV. BOHNERT DID NOT WAIVE HER RIGHT TO BRING TITLE VII CLAIMS**

10         The Archdiocese asserts that Bohnert is barred from bringing her claims because she

11   "failed to exhaust the CBA's mandatory contractual grievance procedures."  Mot. 25.  Bohnert

12   does not dispute that she was covered by the CBA and that she did not file a grievance.  *See*

13   Bohnert Depo. 331:3-8.  Instead, she contends that the CBA did not contain a clear and

14   unmistakable waiver of the right to a judicial forum and therefore does not prevent her from

15   bringing this lawsuit.  Oppo. 28.  She is correct.

16         The CBA contains a "grievance procedure" that states that "[a]ny dispute regarding the

17   meaning, interpretation or application of this Agreement shall be submitted by the grieving party,

18   whether such party is the Union or the Employer, to the grievance procedure as provided herein."

19   CBA at 11.  This consists of an informal settlement procedure in which the aggrieved party first

20   submits a written complaint to the Union's school representative and the Principal.  *Id.* at 11-12.

21   If there is no resolution, the dispute is referred to a Board of Adjustment consisting of two Union

22   representatives and two Department of Catholic Schools representatives.  *Id.* at 12.  If the Board is

23   unable to reach a majority decision, "the Superintendent or the President of the Union acting on

24   behalf of the Executive Board may within (45) forty-five additional days request in writing that

25   the California State Mediation and Conciliation Service submit a panel of names from which the

26   parties shall select one person to serve as the fifth (5th) and impartial member of the Board or as

27   sole arbitrator."  *Id.*  This decision shall be "final and binding."  *Id.*  Finally, the CBA provides

28   that "[f]ailure to comply with the time limits set forth in the steps above shall result in the

1    grievance being withdrawn and deemed waived." *Id.*

2         Before the Federal Arbitration Act ("FAA") was enacted, "Title VII had been interpreted

3    to prohibit any waiver of its statutory remedies in favor of arbitration." *Ashbey v. Archstone Prop.*

4    *Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015) (internal quotations omitted). But because of the

5    value placed on forms of alternative dispute resolution, courts held that Title VII and other civil

6    rights claims could be waived "where appropriate." *Id.* "Congress intended there to be at least a

7    knowing agreement to arbitrate employment disputes before an employee may be deemed to have

8    waived the comprehensive statutory rights, remedies and procedural protections prescribed in Title

9    VII and related state statutes." *Prudential Ins. Co. of Am. v. Lai*, 42 F.3d 1299, 1304 (9th Cir.

10   1994). Thus, "[a]ny bargain to waive the right to a judicial forum for civil rights claims . . . in

11   exchange for employment or continued employment must at the least be express: the choice must

12   be explicitly presented to the employee and the employee must explicitly agree to waive the

13   specific right in question." *Nelson v. Cyprus Bagdad Copper Corp.*, 119 F.3d 756, 762 (9th

14   Cir.1997).

15        In *Nelson*, the Ninth Circuit found that a plaintiff did not waive his right to bring civil

16   rights claims when he signed an acknowledgement that he read and understood an employee

17   handbook that contained an arbitration clause. *Id.* It stated that "[n]othing in either the

18   acknowledgment form or the Handbook itself put Nelson on notice that by not quitting his job he

19   was somehow entering into an agreement to waive a specific statutory remedy afforded him by a

20   civil rights statute." *Id.*; *cf. Ashbey*, 785 F.3d at 1325 (affirming waiver where agreement stated "I

21   understand that it is my responsibility to understand the [handbook], including the Dispute

22   Resolution Policy, and to adhere to all of the policies contained herein. . . During my employment,

23   I agree to abide by the provisions in this Company Policy Manual.").

24        The Archdiocese argues that only "basic contract principles" apply to the application of the

25   CBA and that that all of Bohnert's claims are barred because the CBA prohibits gender

26   discrimination. Mot. 25; Reply 18 (Dkt. No. 143). This position is contradicted by the above case

27   law. In addition, Bohnert's claims are not barred even under basic contract principles.

28        The CBA states vaguely that a "grievance" is deemed waived if the employee does not

United States District Court
Northern District of California

comply with the specified time limits.  CBA at 12.  This provision is unclear at best.  It does not

mention the right to bring suit in any formal adjudicative body.  Nor does it indicate what

"waived" means, or specify whether a "grievance" encompasses potential causes of action in

court.  Because it does not contain an arbitration clause, the policies furthered by the FAA are not

implicated in this case.

In addition, "[w]hile courts should defer to an arbitral decision where the employee's claim

is based on rights arising out of the collective-bargaining agreement, different considerations

apply where the employee's claim is based on rights arising out of a statute designed to provide

minimum substantive guarantees to individual workers."  *Calmat Co. v. U.S. Dep't of Labor*, 364

F.3d 1117, 1126 (9th Cir. 2004).  Bohnert's causes of action encompass a hostile work

environment and the failure to remediate under civil rights statutes, and cannot be considered

rights that arise under the CBA, notwithstanding its prohibition of gender discrimination.

*Williams v. Raley's Superstores, Inc.*, No. C 94-3867 SC, 1995 WL 20462, at *3 (N.D. Cal. Jan.

13, 1995) ("an employee vindicates *contractual* rights under a CBA, not statutory rights conferred

by Congress.").

Similar to the purported waiver in *Nelson*, the CBA does not contain an explicit and

knowing waiver of Title VII rights.  *See Felt v. Atchison, Topeka & Santa Fe Ry. Co.*, 60 F.3d

1416, 1419 (9th Cir. 1995) ("There is no doubt that Title VII rights, which the CBA never

expressly references, exist independent of the collective bargaining agreement.") (internal

quotations omitted); *Lai*, 42 F.3d at 1305 (CBA did not compel arbitration of sexual harassment

claims).  The terms of the CBA do not contain a clear and knowing waiver of Bohnert's right to

bring civil rights claims in federal court.

## V.  TITLE VII CLAIMS

### A.  Statute of limitations

The Archdiocese asserts that Bohnert did not file her Title VII claims within the 180-day

time limit established by 42 U.S.C. section 2000e-5(e)(1).[9]  Mot. 15.  It claims that the last alleged

---

[9] The Archdiocese asserts that the 300-day limit set forth in 2000(e)(1) does not apply, since
Bohnert did not first institute proceedings with a state or local agency.  Because Bohnert does not

United States District Court
Northern District of California

1  act of discrimination was the August 2013 meme incident, which was more than 180 days before

2  Bohnert's complaint was filed.  *Id.*  Bohnert counters that the last act of discrimination was not the

3  August 2013 meme, but the Archdiocese's failure to remediate, which continued into the 2013-

4  2014 school year.  Oppo. 13.

5      Courts recognize that for the purposes of limitations, a Title VII claim may be based upon

6  a "continuing violation" of a hostile work environment.  *Delaware State Coll. v. Ricks*, 449 U.S.

7  250, 257 (1980); *Sosa v. Hiraoka*, 920 F.2d 1451, 1455 (9th Cir. 1990) (plaintiff "may establish a

8  continuing violation not only by demonstrating . . . [an employer] wide policy or practice, but also

9  by demonstrating a series of related acts against a single individual") (internal quotations omitted).

10 If a plaintiff alleges that the discriminatory act is the employer's response to discrimination, and

11 not the underlying act(s) itself, the statute of limitations does not begin to run until the employer's

12 final action on the discrimination complaint.  *See Swenson v. Potter*, 271 F.3d 1184, 1191 (9th Cir.

13 2001) ("Because Swenson contacted an EEO counselor before the Postal Service had even

14 concluded its investigation, she acted well before the forty-five day window had closed, and her

15 discrimination complaint was timely.").  Similarly, if an act contributes to a hostile work

16 environment and occurs within the limitations period, then the statute of limitations does not begin

17 to run until that act occurs.  *Leland v. City & Cnty. of San Francisco*, 576 F. Supp. 2d 1079, 1093

18 (N.D. Cal. 2008) ("the [continuing violations] doctrine is applicable to hostile work environment

19 claims involving related acts that collectively constitute a single unlawful employment practice,

20 but inapplicable to claims for discrete acts of discrimination and retaliation").  "The 'unlawful

21 employment practice' . . . occurs over a series of days or perhaps years and, in direct contrast to

22 discrete acts, a single act of harassment may not be actionable on its own."  *Nat'l R.R. Passenger*

23 *Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

24      Bohnert filed her charge on April 21, 2014 and the EEOC received it the following day.

25 *See* Bohnert Depo., Ex. 1002.  The charge states that over the course of her employment, Bohnert

26 was "subjected to hostile work environment harassment including, but not limited to," the May

27

28

assert otherwise, I will not consider the 300-day limit.

United States District Court
Northern District of California

2013 "upskirt" incident.  *Id.*  It also alleged that Serra failed to take proper action after the upskirt incident.  *Id.*  She stated that it was a "continuing" action, with the dates of earliest and latest discrimination unknown.  *Id.*  In a second filing on May 2, 2014, Bohnert stated that the latest discrimination took place on April 28, 2014.  *Id.*  The last act of discrimination or contribution to the hostile work environment must have occurred no earlier October 24, 2013, 180 days before Bohnert's charge was filed.

The Archdiocese maintains that because Bohnert only described the incident in May 2013, she cannot base her claims on the unpleaded incidents.  However, the Ninth Circuit has stated that "[e]ven where . . . claimants have failed to allege a continuing violation theory specifically in their EEOC charge, we have permitted suit on a continuing violation theory."  *Sosa*, 920 F.2d at 1457; *see also Cornwell v. Robinson*, 23 F.3d 694, 706 (2d Cir. 1994) ("the plaintiff may raise any claim that is 'reasonably related' to those asserted in the EEOC filing, even if that claim was not expressly addressed by EEOC.").  Defendant's position is also contradicted by the EEOC complaint, which alleged that the Archdiocese failed to take proper action after the incident.

Bohnert's allegations are not that the school failed to act appropriately with respect to a few discrete incidents; they are that the school created for a hostile work environment and repeatedly failed to address incidents of harassment at Serra and at other schools.  *See Morgan*, 536 U.S. at 115 ("Hostile environment claims are different in kind from discrete acts.").  I am not persuaded by the Archdiocese's one-sided position that its immediate response and subsequent actions in the summer of 2013 mark the close of its investigation.  The Archdiocese's own brief illustrates that its remediation efforts continued into 2014.  It points to its continued responses in the 2013-14 school year, such as the workshops and formations, that were aimed at fostering a supportive environment.  In the fall, the school sent a series of emails to parents and invited them to a webinar.  Faculty attended a seminar focused on gender respect in early 2014, and the retreat with the offending students who were not expelled did not occur until the spring of 2014.

In addition, Bohnert contends that she did not return after her leave of absence because she felt that the school had not acted to remedy the hostile work environment.  The fact that she was on a leave of absence throughout the 2013-2014 school year does not prevent her from arguing

United States District Court
Northern District of California

that the school took "discriminatory acts" during that time.  *See Jensen v. Henderson*, 315 F.3d

854, 862 (8th Cir. 2002) (finding that plaintiff brought actions within the time limit where she

took a leave of absence due to the hostile work environment because "the hostile work

environment . . . still exists and the [defendant] has refused to ameliorate the environment so that

[plaintiff] can return to work."); *Cornwell*, 23 F.3d at 706 (finding complaint timely where it was

based on years of conduct, with the final act occurring within limitations period).

      Accordingly, I find that there is a triable issue of fact that the Archdiocese took acts at

Serra that contributed to the hostile work environment, or continued a single unlawful

employment practice, within the statute of limitations period.  Bohnert's Title VII claims are not

barred by the statute of limitations.[10]

**B.  Hostile work environment claims**

      The Archdiocese argues that Bohnert's hostile work environment claims fail because its

"responses to the conduct reported were prompt and reasonably likely to stop harassment."  Mot.

16.  Relatedly, it also asserts that Bohnert's "failure to prevent harassment claims cannot survive

summary judgment because Plaintiff cannot show that Defendant failed to establish anti-

harassment preventative measures or fully investigate the inappropriate actions reasonably known

to Serra."  Mot. 19.

      "Title VII is violated when the workplace is permeated with discriminatory behavior that is

sufficiently severe or pervasive to create a discriminatorily hostile or abusive working

environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 17-18 (1993).  To prevail on her claim,

Bohnert must show that there was "an objectively hostile or abusive environment—one that a

reasonable person would find hostile or abusive" as well as a subjective perception that the

environment was hostile.  *Id.*  In determining whether an environment is hostile or abusive such

that it violates Title VII, courts consider "all the circumstances," such as "frequency of

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

---

[10] The parties submitted supplemental briefs regarding Bohnert's alternative theory of timeliness, raised for the first time at the hearing, based upon her filing of a Department of Fair Employment and Housing ("DFEH") complaint.  Because I conclude that Bohnert's Title VII claims are not barred by the statute of limitations, I need not address this argument.

United States District Court
Northern District of California

offensive utterance; and whether it unreasonably interferes with an employee's work performance." *McGinest v. GTE Service Corp.*, 360 F.3d 1103, 1113 (9th Cir. 2004).  "Title VII requires only that the employer take steps reasonably likely to stop the harassment."  *Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 536 (9th Cir. 1993).

An employer may be liable for not only its own actions, but also for the actions of others that it failed to prevent.  The Ninth Circuit has held "that employers may be liable for failing to prevent or remedy sexual harassment among co-workers [or third parties] of which management-level employees knew or in the exercise of reasonable care should have known."  *Folkerson v. Circus Circus Enterprises, Inc.*, 107 F.3d 754 (9th Cir. 1997).  This may occur when an employer "either ratifies or acquiesces in the harassment by not taking immediate and/or corrective actions when it knew or should have known of the conduct."  *Id.* at 756.

The Archdiocese takes the position that the May 2013 upskirt incident, the graffiti, and the other acts of harassment were "discrete acts" that never occurred again.  Mot. 16.  That is not the only rational interpretation of the evidence.  The graffiti was similar to graffiti from a year earlier, and to the meme that circulated a year later.  The Archdiocese never found the author of the meme or any of the graffiti.  In addition, Bohnert submitted evidence of a pattern of related acts of sexual harassment at Serra (and at other Archdiocesan schools) over a period of several years.

Taking a photo or video under a person's clothing is a crime.  *See* CAL. PENAL CODE § 647(j).  It is a serious invasion of privacy and highly upsetting to a reasonble person.  The circulation of such photos or videos by means of technology exacerbates an already demeaning and offensive action.  A teacher's ability to do her job properly is undoubtedly impeded by concerns about being further victimized by an upskirt photo or video, students' lack of respect for her, and the need to monitor social media and other outlets to ensure that students are not posting offensive photos or videos.  Similarly, demeaning graffiti and comments on social media are indicative of a hostile environment and are disturbing not only in their original creation, but in their continued dissemination.  There is a triable issue of fact that the conduct by Serra students was ongoing, related, and both objectively and subjectively hostile.

Bohnert has submitted substantial evidence, most of it unrebutted, that the school

United States District Court
Northern District of California

acquiesced in the hostile behavior of its students by failing to properly take corrective action after every reported incident of harassment and even by fostering an environment that was disrespectful to women.  She presents alternative theories of Title VII violations: that the school failed to adequately address the harassment once it was reported, and that it failed to prevent the harassment in the first place.  Oppo. 18-19.  She has presented sufficient evidence to survive summary judgment on both theories.

First, the undisputed evidence indicates that for many of the alleged incidents of harassment, the school was never able to determine which students were guilty.  After the sexually offensive graffiti was found in the bathroom, the Archdiocese did not discover who created the graffiti, and there is little evidence that it seriously attempted to.  Instead, Serra administrators simply asked the student body to come forward with any relevant information.  The school did not mention the sexual nature of the graffiti to students or address the disrespect for female teachers that it reflected.  It did not find out who authored the graffiti or the later meme.  Indeed, each time a harassing act came to light, it was reported by a teacher or student, not independently discovered by the school.[11]  In arguing that there were only a few isolated incidents of harassment that were promptly remediated at Serra, there is a reasonable inference that the Archdiocese is attempting to use Serra's past failures to discover the perpetrator to shield itself.

Second, there is evidence that the harassment was more widespread than the Archdiocese claims, and that its inaction has failed to bring it to light.  The May 2013 upskirt investigation revealed strong evidence that a longer video of Bohnert and other photos were also circulating.  However, the school never found anything more than the seconds-long video of Bohnert that was included in the police report.  The Archdiocese had full-time IT staff at Serra, but there is no evidence that it used them to proactively help control students' repeated use of offensive social media.  Students who admitted to viewing upskirt photos and deleting them in fear of apprehension were not punished.  In addition, the police report indicated that there was a

[11] Serra submitted evidence that its "Shield the Vulnerable" project addressed gender respect. Ortiz Depo. 175:6-15.  However, the evidence indicates that this program focuses on preventing bullying and sexual abuse of children.  Barrett Decl., Ex. 2, Ex. 10.  It has little relevance to questions of sexual harassment.

"challenge" among students to take upskirt videos. Even though the Archdiocese had experienced multiple instances of upskirt photos and had ample reason to believe it may be a widespread practice among students, it implemented no policy to address it. Indeed, an upskirt video was taken as recently as May 2015.

Third, Bohnert submitted evidence that the Archdiocese did not follow its own internal policies at Serra in investigating the harassment that was directed at her and at others. *See* Oppo. 19. For example, Huntington's testimony indicates that the Archbishop's office often assumed that investigations were conducted properly without ever following up with school leadership or the police. This reflects a lack of investigation at the Archbishop's office in spite of an internal policy that requires it to investigate allegations of harassment. In addition, the deposition testimony of Serra's several administrators often contains contradictions and inconsistent recollections of the investigation, and permits a rational inference that the Archdiocese's response to the sexual harassment in the 2013-2014 school years at Serra was not coherent or serious. *See* Lund Depo. 258:9-289:21 (not recalling whether certain trainings occurred, or whether sexual harassment was discussed in other meetings).

Fourth, there is evidence that Serra faculty and administrators deleted, or instructed students to delete, incriminating photos. They did so while the police investigation was ongoing, and despite knowing that photos had apparently been sent to a significant number of students. The fact that Serra administrators later claimed that they did not delete the photos, or could not remember doing so, further allows a reasonable inference that they deleted these photos in order to minimize the fallout of the incident.

Fifth, Bohnert submitted evidence that Serra's formations related to sexual harassment and gender respect were ridiculed and criticized as ineffective. Several Serra administrators admitted as much. She also provided evidence that the school's responses to harassing conduct before the May 2013 upskirt incident, such as the graffiti that was targeted at her, were criticized by faculty. And there is compelling evidence of related harassment, including upskirt photos or videos, that occurred *after* the May 2013 upskirt incident.

The Archdiocese gives several explanations for its actions. For example, it states that the

1    post-graffiti "Public Announcement" did not mention the sexual nature of the graffiti because it

2    did not want to exacerbate the issue, and that it instructed students to delete the photos in an effort

3    to prevent further circulation.  On summary judgment, I draw inferences from these facts in favor

4    of Bohnert.  These inferences are that the school minimized sexual harassment by not talking

5    about it, or even attempting to conceal it.

6          In *McGinest v. GTE Service Corp.*, a case cited by the Archdiocese, the court denied

7    summary judgment even though it found that the defendants' responses might appear reasonable

8    when looked at individually, and there was no dispute that the defendants prevented further

9    actionable conduct by the offending employee.  360 F.3d at 1120.  The court noted that "[i]naction

10   constitutes a ratification of past harassment, even if such harassment independently ceases."  *Id.* at

11   1120.  It observed that the "opprobrious" behavior "continued with some regularity from 1995

12   through 2000" and stated that "considering the totality of the circumstances, as we must, a

13   reasonable factfinder could conclude that [the defendants'] corrective measures were inadequate

14   for failing to impose sufficient penalties to assure a workplace free from . . . harassment."  *Id.* at

15   1135 (internal quotations omitted).  Similarly, this case includes a substantial amount of evidence

16   from which a rational jury could determine that Archdiocese's responses to harassment often

17   amounted to inaction or were otherwise inadequate.

18         The cases that the Archdiocese cites are distinguishable.  In *Saxton v. American Tel. & Tel.*

19   *Co.*, the court granted the defendant's motion for summary judgment where there was evidence of

20   only two isolated incidents of harassment by one employee.  10 F.3d 526 (7th Cir. 1993).  In

21   *Summa v. Hofstra University*, the court did not determine whether the plaintiff's "showing of

22   harassment was sufficiently severe or pervasive to constitute a hostile work environment under

23   Title VII."  708 F.3d 115, 124 (2d Cir. 2013).  It concluded that the conduct could not be imputed

24   to the defendant because the plaintiff did not complain of many incidents of harassment by third

25   parties.  *Id.*  By contrast, the Archdiocese knew of the incidents of harassment alleged in this case.

26   Finally, in *Lucero v. Nettle Creek School Corp.*, the court addressed "isolated incidents that were

27   neither sufficiently severe or pervasive to rise to the level of actionable harassing conduct."  566

28   F.3d 720, 732 (7th Cir. 2009).  As discussed, there is a disputed issue of material fact that the

incidents at Serra were not isolated, but part of a pattern of harassment.

Finally, although the Archdiocese cited to *Ellison v. Brady*, 924 F.2d 872, 880 (9th Cir. 1991) at the hearing, the court in that case denied summary judgment on claims of sexual harassment.  This case is arguably much stronger than *Ellison*, as that case involved harassment by one employee of another, and appeared in many ways to be an isolated incidence.  Nonetheless, the court stated that "[w]e cannot say as a matter of law that [plaintiff's] reaction was idiosyncratic or hyper-sensitive" and that "[e]ven though the hostile environment had been eliminated" when the defendant was transferred to another office, "we cannot say that the government's response was reasonable under Title VII."  *Ellison*, 924 F.2d at 880, 882.

In all, the Archdiocese's actions in response to each successive act of harassment fell short in many ways.  The school (and the Archbishop's office) did not appear to learn from, or respond to, each instance of harassing conduct or to prevent similar occurrences in the future.  Instead, the evidence indicates that students believed that they could get away with disrespectful behavior; indeed, many perpetrators were not caught.  I cannot accept the Archdiocese's position without making inferences in its favor, and accepting its interpretation of disputed material facts in violation of Rule 56.  The evidence raises a triable issue of fact that the Archdiocese failed to take proper corrective action and acquiesced in creating a hostile work environment for Bohnert and other females.  The Archdiocese's motion for summary judgment on Bohnert's hostile work environment and failure to prevent harassment claims is denied.

## VI. EMOTIONAL DISTRESS CLAIMS

The Archdiocese asserts that the Workers' Compensation Act bars both of Bohnert's emotional distress claims.  Mot. 21.  The California Workers' Compensation Act ("CWA") provides an exclusive remedy against employers and preempts civil action for certain injuries.  Cal. Lab. Code § 3602.  When an injury "occurred at the worksite, in the normal course of the employer-employee relationship . . . workers' compensation is plaintiffs' exclusive remedy for any injury that may have resulted."  *Miklosy v. Regents of Univ. of California*, 44 Cal. 4th 876, 902 (2008).  But "[w]here a plaintiff's emotional distress claim results from a defendant's misconduct which exceeds the normal risks of the employment relationship, a plaintiff's claim is not

36

United States District Court
Northern District of California

1    preempted by the WCA." *Evans v. Hard Rock Cafe Int'l (USA), Inc.*, 2007 WL 2782775, at *3

2    (E.D. Cal. Sept. 24, 2007) (citing *Fretland v. County of Humboldt*, 69 Cal. App. 4th 1478, 1492

3    (1999)).

4         In my prior Order denying defendant's motion to dismiss, I noted that Bohnert had alleged

5    that defendants' response to the harassment allegations was unreasonable and thus fell outside of

6    the normal course of workplace conduct.  Order at 8.  I found that the alleged conduct did not

7    occur within the normal course of employment and was not preempted by the CWA.

8         On summary judgment, Bohnert has presented facts that support her allegations in the

9    Complaint.  As already discussed, Bohnert established a triable issue of fact that the Archdiocese's

10   response to the harassment was unreasonable.  Construing the facts in the light most favorable to

11   Bohnert, the school repeatedly failed to follow its own internal investigatory procedures,

12   minimized actions related to sexual harassment, and even condoned its employees' decisions to

13   direct students to delete any incriminating photos on their phones.  Therefore, Bohnert's claims are

14   not barred by the CWA.  *See Evans*, 2007 WL 2782775, at *3.

15        The Archdiocese also contends that the intentional emotional distress claim fails because

16   its conduct - the failure to investigate and/or remediate - was not "outrageous."  Mot. 20.  It also

17   moves for summary judgment on the negligent infliction of emotional distress claim because it

18   could not have foreseen the risk to Bohnert.  *Id.*

19        To prove a claim for intentional infliction of emotional distress, a plaintiff must establish

20   "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless

21   disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or

22   extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the

23   defendant's outrageous conduct." *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991).

24   Conduct is "outrageous" or "extreme" where it "exceed[s] all bounds of that usually tolerated in a

25   civilized society." *Schneider v. TRW, Inc.*, 938 F.2d 986, 992 (9th Cir. 1991) (internal quotations

26   omitted).  "Where reasonable persons may differ, the trier of fact is to determine whether the

27   conduct has been sufficiently extreme and outrageous to result in liability." *Tekle v. United States*,

28   511 F.3d 839, 856 (9th Cir. 2007) (internal quotations omitted).  To prove a claim for negligent

infliction of emotional distress Bohnert must establish that "(1) defendants had a duty, (2) defendants breached that duty, (3) defendants' conduct caused plaintiff's emotional distress, and (4) plaintiff suffered damages from defendants' conduct." *Simpson v. Martin, Ryan, Andrada & Lifter*, No. C 96-4590 FMS, 1997 WL 542701, at *6 (N.D. Cal. Aug. 26, 1997).

In my prior Order, I determined that "[a] reasonable observer or trier of fact could find [the alleged] actions to be 'outrageous,' 'extreme,' and beyond 'that usually tolerated in a civilized society.'" Order at 9. Bohnert has supported these allegations with facts from which a jury could conclude that Serra acted in an outrageous manner. Therefore, I again reject the Archdiocese's argument to dismiss Bohnert's intentional infliction emotional distress claim.

I am also not persuaded that the Archdiocese could not have foreseen the risk to Bohnert. Multiple other upskirt photos and attempts had occurred at Serra and other Archdiocesan schools. Bohnert herself was the victim of prior sexual harassment. And although Serra contends that Bohnert cannot sustain any of her harassment claims, I have already rejected that argument. *See* Mot. 20. Therefore, the Archdiocese cannot establish that no triable fact finder could find in favor of Bohnert on her negligent infliction of emotional distress claim. Its motion for summary judgment on Bohnert's emotional distress claims is DENIED.

## CONCLUSION

For the above reasons, defendants' motion for summary judgment is GRANTED to dismiss the FEHA claims against Serra and DENIED in all other respects.

**IT IS SO ORDERED**.

Dated: September 25, 2015

WILLIAM H. ORRICK
United States District Judge